I think we're ready to proceed. Please identify yourself, counsel, and we'll start the 15 minutes. Good morning, your honors. My name is Randall Weiner. I'd like to reserve five minutes for rebuttal, and I'm aware that's my responsibility to keep track of that. I, your honors, I'm counsel for Logan and Beth Ball, who lost their 18-year-old daughter when the vehicle she was driving in drove down what appeared to be the continuation of Forest Service action. In fact, the magistrate found that the Forest Service acted in a willful fashion in failing to warn. The question for the court today is whether the discretionary function exception applies to shield the Forest Service from potential liability under the Federal Tort Claim Act. The Berkovitz test is the test that's applied to determine if the discretionary function test applies. The Berkovitz test has two parts. A part that requires that the conduct not be mandatory, and the part that says that the conduct must be based on public policy considerations. But not just any public policy considerations, the action that's complained of, in our case, the non-action, the failure to warn, must be grounded in the policy of the regulatory regime, and that's from U.S. v. Galbert, 499 U.S. at 325. I'd like to start with the second prong of the Berkovitz test, if I said, not only implicates, not only does not implicate public policy considerations, but that the decision not to warn was never embedded in any of the policies that the Forest Service disclosed in this case. The Forest Service disclosed a policy about remediating mine shafts. And the timing for remediating mine shafts. But there is no policy to not warn, to not give the public warnings of a specific hazard. The situation is quite similar to the case of Duke v. the Department of Agriculture, where the court found that there was a, quote, specific hazard distinct from other hazards generic to a national forest. And the court went on to say, if the failure to post warning signs for falling rocks, this was a falling rock case in Gila National Forest, if the failure to post warning signs for falling rocks is found to implicate policy concerns, this approach would, quote, eviscerate the second step of the Berkovitz and Galbert test, and would allow the exception to swallow the FTCA's sweeping waiver of sovereign immunity. Counsel, this is Judge Hart. How many mine shafts, abandoned mine shafts, are there in this forest? Hundreds, possibly thousands. But none of those mine shafts are what we consider to be a specific hazard. And... Why is that? You know, I... I'm sorry, Your Honor? Continue. I was going to ask, why is it not a specific... Why are the others not specific hazards? We've distilled the cases, Your Honor, and we've believed that there is a bright line test for what makes a specific hazard. First of all, our judge called it a specific hazard, but what does that mean exactly? And we believe that the only way to make sense of the disparate cases in the Tenth Circuit on failure to warn for hazards on public lands is a four-part test. And a specific hazard is one where that involves a popular area, that, two, draws the public to it, and three, has the illusion of safety, and four, where there are no warnings by the government of the hazard. And... Let me ask you, and this is Judge Hart's... I'm sorry, I shouldn't just butt in. I need to say counsel, so you'll know I'm asking you a question. Did you raise the I don't believe my opponents are saying that we didn't raise the specific hazard argument in district court. We certainly did. It was perhaps the strongest or primary argument in the district court. They've raised waiver with respect to the first prong of the Berkovitz test, but yes, we raised the specific hazard in the district court. And, you know... Counsel, Judge Matheson, do you have any questions? Yes, I do. I'm interested in your addressing the relationship between the two parts of the Berkovitz test. If we decide that the failure to safeguard or warn was discretionary under the first step, do you agree that you have the burden under Gabbert, the Gabbert decision, to overcome a presumption that the failure to warn was based on policy considerations? I can meet that presumption. So, most of the cases in this circuit do not state that a that the reason our case is so strong is simply because there's no public policy that would prevent warning signs, as I was saying before. And the cases, we've analyzed six cases. The three cases on the plaintiff's side are Duke versus the Department of Agriculture, which involved rockfall in the Gila National Forest. Boyd versus U.S., which involved a dangerous swimming hole. And Smith v. U.S., which involved a child falling into thermal pools in Yellowstone National Park. In each of those cases, the Tenth Circuit decided that a warning was required. And there was no public policy that would prevent the kind of warning. And, in fact, as I said, that would eviscerate, basically, the second step. On the government side, they point to KINE, K-I-E-H-N, which involved petroglyphs. Zumwalt v. U.S., which involved a wilderness trail in Pinnacles National Park. And Johnson v. U.S., which involved a backcountry climbing area where regulations were to be kept to a minimum. And in those cases, there was a policy that would prevent warnings due to aesthetic reasons. And, you know, your honors in New Mexico, Judge Carson and Judge Hartz, one-third of the land in New Mexico, as you're probably aware, is federal land. And, Judge Matheson, you're only too aware of the fact that in Utah, 75 percent of the land is public land. And so there's this tension between the federal government wanting to have control and immunity on decisions it makes on its property versus private parties who want the same rights on public lands that they have on private lands. Counsel, could I just jump in and ask you, this is in response to your discussion of the various cases and then your earlier presentation of your four-part test. Is the four-part test you're advancing your distillation or your attempt to reconcile the is there any published decision that recognizes your test? No, your honor. We are proposing this bright line test for the Tenth Circuit to apply, because from our standpoint, it's the only way to make sense of these disparate cases. Where there's a specific hazard, the courts have said a warning is required. And where there's not a specific hazard, the courts generally have not. So, no, I can't point you to a specific case, just to the back of our law office. Counsel, Judge Carson, do you have questions? I do. So, on your specific hazard test, I just want to change the facts up a little bit. You've got the road leading to this abandoned mine shaft. What if this road led to, say, a natural cliff or a very severe drop-off on the other side of the embankment? Would you have the same position as far as a duty to warn? Well, let's run through the analysis, if we can. In your situation, the first question is, is it a popular area? So, let's assume it is on your hypothetical. Are people drawn to the hazard? Yes, there's a road that takes folks down it that might lead to a specific hazard. Are people actually, is there an illusion of safety? Would the public think that this road was actually going to lead to a hazard or not? And, finally, were there any warning signs? So, I think under your analysis or under your hypothetical, yes, this would be a specific hazard and there would be a duty to warn. Okay. Now, don't you think that the road category where the Forest Service designated this as a Category 2 road where people should expect that they might encounter unsafe conditions cuts against your idea that there's an illusion of safety? This was an area that was quite popular, Your Honor, for camping. The magistrate found that there were a number of campsites that were in use that night, that the road was active, that, or at least the area around the road was active, even at 3 a.m. in the morning when this accident occurred. So, no, this was a popular area. Folks don't know the distinction and read the regulations about Category 2 versus Category 1. I think the child that fell through the pools in Yellowstone, there were warnings in Yellowstone. Everyone knew that you get out of your car, you're risking it a bit. Nonetheless, there was a trail that led back to the pools and the Tenth Circuit decided that that was one place in Yellowstone that required a warning. This is a similar case. We have a 20-foot abandoned mineshaft and a road, really, a road that leads to all intents and purposes right over the embankment down into the mineshaft. The other main part of the road had tree limbs that were five and four feet high and it was narrower. So, to all intents and purposes, my client's daughter was on the right road and a simple warning sign. In Duke, they said a warning sign is inexpensive. So, the Forest Service has no reason not to put up an inexpensive warning sign if they know the hazard exists. And in this case, the Forest Service was well aware that this hazard exists for years. I'd like to reserve the rest of my time, if I could, for rebuttal. This is Judge Harsh. Let me ask if Judge Matheson or Judge Carson has any follow-up questions they want to ask now. Nothing further. No, I'm fine, thank you. Okay, counsel. So, thank you very much. I'll reserve the rest of my time for rebuttal. I'm showing I have four minutes. No, the bell rang with three minutes left. It's probably closer to two or two and a half. This is the courtroom deputy, Your Honor. I have one minute and 28 seconds rebuttal time left. Very good. Thank you for the warning. Thank you. Maybe the bell was not as loud as I thought. Okay. Okay, counsel Rapoli, please identify yourself. This is Cason Ross for the United States, Your Honor. You may proceed. Thank you, Your Honor, and may it please the court. The district court correctly held that discretionary function protects the government for liability based on the context plaintiffs have alleged here. In managing the national forest system, the Forest Service must address an array of challenges in deploying very limited resources. The agency must balance a variety of competing policy considerations, including the interest in providing the public with access to the forest's natural features and promoting visitor safety and convenience. The district court and the magistrate judge carefully applied the Supreme Court's well-established two-step test of the discretionary function exception, concluding that the conduct here squarely falls within that exception. Now, as the court recognized in questioning opposing counsel, the Forest Service manages millions of acres of land and implicating over 11,000 mines in this particular national forest. Now, it bears emphasizing that every time the Forest Service goes to inspect any particular mine to remediate it, additional mines are uncovered and other additional hazards. Plaintiffs' alleged conduct here doesn't simply implicate the one sign for this particular mine, but thousands of signs for thousands of hazards in the national forest. The Forest Service decision whether and how to place warning signs and whether and how to remediate those hazards is squarely protected by the discretionary function exception, as this court has held multiple times. With that, I open myself to questioning from the court. Okay. Thank you. This is Judge Hart. Well, Mr. Weiner was focusing on specifics about this particular hazard, that it was a well-traveled area. The Forest Service knew it was well-traveled. The Forest Service knew this was a very dangerous place. If you drove off the road, the Forest Service knew that what would look like the continuation of the road was not. That was the path to disaster. How do you respond to that when the Forest Service knows? First of all, do you challenge the knowledge of the Forest Service with respect to this location? Second, if counsel for Appellant is correct about the clear danger here, why would that not require remedial action? Sure. For one, it bears emphasizing that opposing counsel began his presentation by noting that what appeared to be a forced road led to this particular abandoned mine shaft. Now, it was undisputed in district court that the pathway that led to the mine shaft was not on the forced road. That was instead a garden path, if you will, that led to the mine shaft. Plaintiff's own evidence, prepared by a private investigator, clearly demonstrated that the path departed from the forced road leading to the mine shaft. This is Judge Hart, but was that apparent? It sounds like sometimes when you're in the back areas, you take the wrong turn because it actually looks like the main road. Maybe it wasn't officially the forest road, but what about the appearance? Sure. For one, Your Honor, there are untold number of hazards in the forest surrounding forced roads, but also the motor vehicle use map for the Boulder Ranger District encompassed this area of the natural forest, clearly warned drivers that, a quote, designated areas may contain dangerous or impassable terrain. Many designated roads and trails may be passable only by high clearance vehicles or four-wheel drive vehicles, and additionally indicates that many of these roads receive very little maintenance. Indeed, the Forest Service determined that this particular road would be maintained at, quote, that drivers should not have any expectation that these roads are maintained with any level of regularity. I can point you to our appendix page, or the Joint Appendix, pages roughly 142 to 145, in which several pictures of examples of level two roads are given, in which the roads are very, very narrow. Terrain basically abuts, the natural terrain that is, essentially abuts those that are low. There may be any number of hazards on those roads themselves, such that it would be impossible for the Forest Service to warn of any number of hazards that is 20 feet off the road, for one, not to mention hazards on the roads themselves. Well, Judge Hart, just one final question, and then I'll turn it over to the other members of the committee. We can't police all 10,000 mineshafts, every road, but was there specific knowledge here that one driving along this level two road would ordinarily think that the road to the mineshaft, the disastrous road, was the continuation of the forest road? And if so, what excuse would there be for not warning at that point? Sure, Your Honor. So the Forest Service would have been aware of the abandoned mineshaft in this case, because there was a 1993 geological survey done to identify abandoned mines in the National Forest, which identified, you know, over 11,000 mines that we pointed to. So they were certainly aware of the mine here, which it bears noting was closed in So the Forest Service knew that the mine existed. That's not to say that its awareness of the mine required placing a warning sign. As the multiple declarations in this case mentioned, there were multiple policy considerations at issue, whether to place warning signs at mines, and whether and how to fix those mines. Cost considerations, as well as social policy considerations, underscored each of those decisions, namely the, you know, the Forest Service own budget, as well as the Forest Service relationship with the Colorado State Agency. It bears mentioning that the Colorado State Agency, the Colorado Division of Reclamation, Mining and Safety, that is, worked very closely together to remediate these abandoned mining features. Council, I'm going to interrupt there. Judge Matheson, do you have questions? Yes, Council, I have a question that I'd like to draw from the Zumwalt case. In that case, the court said, and I'm just going to quote it briefly, the decision not to place additional warnings on the trail could not be divorced from the policy decision to maintain the area in its wilderness state. That's the end of the quote. My question is, did the Forest Service here make a policy decision to maintain the area around the abandoned mine shaft in its natural state? Yes, that's my understanding, Your Honor. Part of that decision to place warning signs throughout the National Forest would have been tied to maintaining the natural beauty of the area. Now, we acknowledge, as our brief mentions, that the declarations we submitted in this case do not explicitly invert to the fact that the decision to place warning signs was tied to maintaining a wild state. But that's not to say that that was part of the decision-making process here. You know, as we mentioned, there are untold thousands of mines throughout the National Forest system. To place warning signs next to each of them would change the character of the National Forest. In this particular area, it was classified as what's called a dispersed recreation area, which would approximate a much more wild area of the National Forest. So, for natural hazards to have warning signs next to them throughout these areas would completely distort the character and quality of those places that have been maintained for the public. Well, let me just follow up. I'm or posting warning signs would conflict with the area's natural setting when the mine shaft itself is a human-made feature and a known hazard since, as you pointed out, at least 1993. Sure. So, the mine itself, you know, was not entirely natural. But because it was abandoned for some untold number of years, it had begun to revert to the natural state of the forest. And even by plaintiff's own theory, it was not obvious that the mine shaft was different from the National Forest such that you wouldn't have known that the hazard was there. So, placing a warning would change the character of that site such that it would be obviously apparent that there was some man-made activity in that area. That, of course, did not go to say that other policy considerations underscored or underlied the Forest Service decision-making in this respect. Both the economic and policy and social policy considerations that the Forest Service very carefully considered as to how to manage the forest in this area. I take it that sort of underlying this is an argument that even if the Forest Service made a bad policy choice or was negligent in not posting a sign, given what it knew, that that doesn't prevent the discretionary function exception from applying. Is that correct? Is that an accurate statement? That's absolutely correct, Your Honor. It is not a question of whether it was reasonable for the Forest Service to act in a particular way. But as Supreme Court has explained repeatedly, but most recently in Galbert and Berkovitz, whether that decision-making was susceptible to policy analysis. The Forest Service declarations here make very clear that its decision-making was done with that sort of consideration in mind. Counsel, Judge Carson, do you have any questions? I do. Thank you. In looking at the case, it seems to me that the case at the district court focused much more, it was much more of like a road maintenance case, and that today the argument is shifting more to discussing the hazardous nature of the mine shaft itself. Do you view it like that? Yes, Your Honor. And the main reason that has taken place is that plaintiffs have proposed evolving theories throughout this litigation, and the government has responded to those theories, as we are the defendants here, at each turn. And you are absolutely correct that this case began as a road remediation case, which is arguably why the Forest Service declarations submitted in district court are focused primarily on the agency's decision as to how to classify particular roads and how those roads are maintained. So the bulk of the evidence that we presented in district court had to do with the road maintenance itself. And when it became clear that that was a faulty theory, plaintiffs pivoted to something more approximate to a failure to warn kind of case, as they've brought before this court. Again, the government makes the same arguments, obviously, in a different perspective, that even the failure to warn is subject to policy analysis under the discretionary function exception. Was there anything in the record that speaks to how accessible the other 1,300 mine shafts in the forest are? I mean, presumably someone at some time had roads to these old mines. Do you have any knowledge of what the record says about that? I know, Your Honor, I don't believe that information is in the record. I will only correct a factual premise in your question, which there's over 11,000 known mines, not 1,300. Of course, you are also correct that each of these mines inherently must have had a road connecting it to some other possibly government-maintained road. Just by the nature of the activity taking place at the mine, one would expect there to be vehicle traffic that would create some sort of pathway. Okay. And then the Forest Service manual, if we look at the record before the district court, is there going to be any briefing that No, Your Honor. These sections of the Forest Service manual are, again, new material cited to this court. Those provisions were at no point cited to the district court, and plaintiffs have certainly not identified where in the district court briefing they were raised. You know, this court's rules require as much. On the merits, I can assuage the court's concerns that I reached out to my Forest Service colleagues, and they notified me that on querying the infra database, which is short for infrastructure, within the natural resource manager system, that is the NRM system, which catalogs all of the developed recreation sites, encompassed by sections 2332 and 2332.1 of the manual, that this particular area where the We would have obviously presented that information to the district court for consideration of whether these manuals apply or these sections of the manual apply to this area. But also, I will refer the court to the motor vehicle use map. If Your Honor doesn't mind, I would just like to finish my sentence. Thank you. Just to say that the motor vehicle use map for the Boulder Ranger District clearly says that this area where the accident took place is a dispersed recreation area, which is not subject to the inspection and otherwise requirements of those sections of the Forest Service manual. With that, the government respectfully requests that the court affirm the district court's dismissal. Well, let me just ask, Judge Matheson, do you have any further questions? No, thank you. Judge Carson? No, thank you. Thank you, counsel. How long, Mr. Wyman? One minute and 28 seconds, Your Honor. Thank you. You may proceed. Did we lose you? Did we lose Mr. Weiner? Hi. I had it on mute. I'm ready to proceed. Yes, please. If the government's position goes too far, Your Honors, it's too extreme. If all that's required to meet the second prong of the Berkovitz test is an after-the-fact reference to policies that don't address warnings for specific hazards, no danger, no matter how great, would fall outside the reach of the discretionary function exception. That is just not the law in this circuit. This is not a wilderness area, as the questioning tried to bring out. The area up around Gold Hill in the Arapaho National Forest in the hills of Boulder is littered with campsite, and there is no policy to keep the aesthetics the way they are, like they are in the Kine and the Zumwalt and the Johnson cases. This is an area that would not be tarnished in the slightest with a warning sign for this specific hazard. And remember, this is not like the tens of thousands of other abandoned mine shafts. The magistrate here found that the mine shaft was not just a potential hazard, but presented the high probability of harm to those who use 456.1a. And I'll finish by saying that although we didn't point to the specific sections of the Forest Service Manual, the Forest Service Manual in general constrains the Forest Service, and our pointing to new sections is a new argument on a claim that was properly presented. Thank you, counsel. 19-1161 is submitted, and counsel are excused.